```
USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 08/24/2016
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MERCK & CO., INC.,

                              Petitioner,

                v.                                    No. 16-CV-22 (RA)

PERICOR THERAPEUTICS, INC.,                           OPINION & ORDER

                              Respondent.

RONNIE ABRAMS, United States District Judge:

    In December 2011, Respondent PeriCor Therapeutics, Inc. initiated an arbitration against Petitioner Merck & Co., Inc. after Merck stopped a Phase III clinical trial for a drug called acadesine, which may have the potential to reduce the risk of a certain type of injury in patients recovering from heart bypass surgery. On December 10, 2015, the American Arbitration Association (the "AAA") issued an award (the "Award") concluding that although Merck had breached its contractual obligations to PeriCor, which had acquired intellectual property rights in acadesine, PeriCor had failed to prove any monetary damages flowing from the breach. Merck subsequently initiated this action to confirm the Award, and PeriCor moved to vacate it on the grounds that one of the arbitrators was evidently partial, that the arbitrators manifestly disregarded Delaware law of contract damages, and that the arbitrators failed to render a final decision because they disregarded Delaware law regarding a restitutionary theory of contract damages. For the reasons that follow, Merck's Petition to Confirm the Award is granted and PeriCor's Motion to Vacate the Award is denied.

## BACKGROUND

The Court assumes the parties' familiarity with the Award and sets forth only those facts necessary to resolve Merck's petition to confirm and PeriCor's motion to vacate.[1]

## I.     The Licensing, Development, and Commercialization Agreement

PeriCor owns a sublicense to the intellectual property rights in acadesine, which, as noted above, may mitigate the risk of a certain type of injury that can follow heart bypass surgery. *See* Award ¶¶ 1–3, 6–7. On June 27, 2007, by way of a License, Development, and Commercialization Agreement (the "Agreement"), PeriCor granted to Schering Corporation (which subsequently merged with Merck) "an exclusive . . . sublicensable . . . royalty-bearing license" to develop acadesine and bring it to market. Spehr Aff. Ex. 7 § 2.1 [hereinafter "Agmt."]; *see* Award ¶ 8. In the Agreement, Schering agreed to pay PeriCor $20 million for the license, *see* Agmt. § 10.1, to pay PeriCor additional sums upon completing specified developmental milestones and royalties based on future acadesine sales, *see id.* §§ 10.2, 10.3, and to be "solely responsible for all costs related to" developing the drug, *id.* § 5.3. Those costs included the expense of developing and completing a Phase III clinical trial. *See* Award ¶ 8.

The Agreement gave Schering broad discretion in determining how to develop and commercialize acadesine. Specifically, although the Agreement anticipated that the parties would attempt to develop consensus on how to proceed, *see* Agmt. § 4.3(a), Schering had "sole and final responsibility and discretion for all decisions relating to the Development" of the drug, *id.* § 4.3(b). In exercising that discretion, however, Schering was obligated under Section 8 to use "Commercially Reasonable Efforts." The Agreement defined "Commercially Reasonable Efforts" to mean

---

[1] The facts are taken from the Award and the parties' submissions, and are undisputed unless otherwise noted.

> such efforts and resources as are commonly used in the pharmaceutical industry for an ethical drug of similar commercial potential at a similar stage in its lifecycle, taking into consideration its safety and efficacy, the cost to Develop and Commercialize the product, the risks inherent in the Development and Commercialization of the product, its competitiveness compared to alternative products, the proprietary position of the product, the scope, timing and likelihood of Regulatory Approvals, the profitability of the product and all other relevant factors.

*Id.* § 1.7; *see also* Award ¶ 59 & n.13.

The Agreement also contained detailed provisions regarding its termination. First, Sections 16.4 and 16.5 authorized the parties to terminate the Agreement should either counterparty commit a material breach or become insolvent. Second, Section 16.6 authorized Schering to terminate the Agreement "at any time on ninety (90) days prior written notice to PeriCor." Agmt. § 16.6. As is relevant here, in the event that PeriCor terminated the Agreement because of Schering's breach pursuant to Section 16.4 or Schering elected to terminate pursuant to Section 16.6, Section 16.8 provided that Schering's license in acadesine would terminate and PeriCor would obtain an interest in any acadesine product Schering developed. Also relevant here, in the event that Schering elected to terminate pursuant to Section 16.6 while a Phase III clinical trial was ongoing, Schering would, in addition to its obligations under Section 16.8, "be responsible to pay PeriCor all amounts required to complete the Phase III Study up to a cap of Twenty Million Dollars ($20,000,000)." *Id.* § 16.10(a).

Finally, the Agreement described how disputes arising under the Agreement would be resolved. PeriCor and Schering agreed that if they "are unable [to] resolve a given dispute, [they] shall have the given dispute settled by binding arbitration." *Id.* § 17.1. Any such arbitration would be governed by AAA rules and "be conducted by three (3) arbitrators who are knowledgeable in the subject matter at issue in the dispute," with one arbitrator selected by PeriCor, one selected by

Schering, and one selected by the two arbitrators chosen by the parties. *Id.* § 17.2(c). PeriCor and Schering also agreed that Delaware law would govern the Agreement. *See id.* § 17.4.

## II.    The Phase III Clinical Trial

After entering into the Agreement, Schering developed a Phase III clinical trial to test acadesine's efficacy. *See* Award ¶ 9. The trial's protocol was finalized on November 17, 2008. *See* Spehr Aff. Ex. 9. The trial began in April 2009, and the first patients were enrolled in May 2009. *See* Pet'r's Opp. Br. at 7; Resp't's Br. at 4.

In November 2009, Schering merged with Merck, "at which point Merck effectively inherited Schering's rights and obligations under the Agreement." Award ¶ 14; *see also* Spehr Aff. Ex. 10 at 11:5–11. Merck then conducted "an extensive review of the combined drug pipelines of the two companies" and concluded that "if the [acadesine] trial could be stopped early, it would save Merck considerable sums of money." Award ¶¶ 14, 17. At that time, the acadesine trial "was costing Merck about $5 million per month in ongoing expenses required to recruit patients and proceed with all the trial tasks." *Id.* ¶ 17.

On April 26, 2010, Merck amended the trial protocol to add "two interim futility analyses." Spehr Aff. Ex. 29 § 8.6. The first analysis—to be conducted based on data from 30% of the trial's total number of participants—would determine whether "there is at least a 20% probability" that the trial would be successful at its conclusion. *Id.* The second analysis—to be conducted based on data from 40% of the trial's total number of participants—would determine whether "there is at least a 65% chance" that the trial would be successful at its conclusion. *Id.* If either analysis "show[ed] the study to be futile . . . , the study w[ould] be stopped immediately." *Id.* There is no dispute that PeriCor objected to Merck's decision to add the futility analyses to the trial's protocol, or that Merck amended the protocol despite PeriCor's objection. *See* Resp't's Br. at 8; Pet'r's Opp. Br. at 9–10.

4

The first futility analysis concluded that the trial had a 3.4% chance to be successful. *See* Spehr Aff. Ex. 34 at DCRI00000010. Merck then terminated the trial, *see* Award ¶ 19, and PeriCor initiated arbitration pursuant to the arbitration clause in the Agreement.

### III.   The Arbitration

#### A.   Selecting the Arbitrators

Pursuant to Section 17.2(c) of the Agreement, PeriCor and Merck each selected an arbitrator "knowledgeable in the subject matter at issue" to resolve their dispute. As is relevant here, Merck selected Taysen Van Itallie. *See* Spehr Aff. Ex. 44. According to the resume he submitted to the AAA, Van Itallie is currently a lecturer-in-law at Columbia University School of Law and an adjunct professor of law at Seton Hall University School of Law. *See* Finley Decl. Ex. K; Speher Aff. Ex. 45. From 1977 to 1996, Van Itallie worked as an attorney at Patterson Belknap Webb & Tyler LLP ("Patterson Belknap"), where he was elected partner in 1985. *Id.* From 1996 to February 2009, he was an associate general counsel and chief of global litigation at Johnson & Johnson. *Id.* From July 2009 to January 2010, he served as the director of the Division of Law for New Jersey's Department of Law and Public Safety. *Id.*

On November 2, 2012, Van Itallie submitted his disclosure paperwork as required by the AAA. *See id.* He made three conflict disclosures that are relevant here. First, he disclosed that he "had infrequent professional dealings over the years with Bruce Kuhlik, Merck's General Counsel." *Id.* Second, he disclosed that "Schering's head of litigation at the time the company was acquired by Merck, PD Villarreal, now at GlaxoSmithKline, is a friend I see rarely." *Id.* Van Itallie explained that he met Villarreal "through the Chief Litigation Counsel Association, a group [Van Itallie] co-founded in the 1990[]s." *Id.* Third, Van Itallie disclosed that "[o]ver the years while at [Johnson & Johnson he] had occasional professional dealings with other members of the Merck and Schering law departments, but [he] h[ad] no knowledge that any h[ad] involvement in

this case." *Id.* Van Itallie concluded that "[n]one of these connections . . . compromise[d his] neutrality or impartiality in any fashion." *Id.*

On November 5, 2012, the AAA appointed Van Itallie as an arbitrator. *See* Spehr Aff. Ex. 49. On November 12, 2012, PeriCor objected to Van Itallie's appointment, arguing that he "has had pervasive and continuing dealings and relationships with Merck and Schering . . . that cause him to be biased in [Merck's] favor." Finley Decl. Ex. L at 1; Spehr Aff. Ex. 50 at 1. PeriCor contended that when Van Itallie worked at Johnson & Johnson, the company "was involved in an important joint venture with Merck" that "developed and marketed a broad range of non-prescription medicines for U.S. consumers." *Id.* at 2. PeriCor also argued that Van Itallie failed to disclose that his prior law firm, Patterson Belknap, "represented that joint venture in several important lawsuits while Mr. Van Itallie was a partner at the law firm" and that Patterson Belknap "continued to represent Merck's joint venture after Mr. Van Itallie left the firm to go in-house . . . at Johnson & Johnson." *Id.* On November 19, 2012, Merck opposed PeriCor's objections. *See* Spehr Aff. Ex. 51.

On February 19, 2013, Van Itallie made additional disclosures. *See* Finley Decl. Ex. M; Spehr Aff. Ex. 52. Van Itallie first noted that "[t]o the extent there was regular contact with Merck or Schering lawyers during [his] time at [Johnson & Johnson], it was in connection with civil justice reform activities." *Id.* Van Itallie elaborated that from 2006 to 2008, he "was co-chair of the operating committee of the Civil Justice Reform Group," which met on a monthly basis, and that "Lisa Martinez Wolmart, then a Schering lawyer and now at Merck, was also on the operating committee and attended meetings." *Id.* Also "[i]n connection with civil justice reform activities, [Van Itallie] attended a number of other meetings and phone calls at which Ken Frazier, while he was General Counsel of Merck and Tom Sabatino, while he was Schering's [General Counsel],

6

were present." *Id.*  Second, Van Itallie disclosed that he "had a brief interaction with Bruce Kuhlik [Merck's General Counsel] in late 2011 when [Van Itallie] sought [Kuhlik's] support regarding [Van Itallie's] interest in interviewing for the [Pharmaceutical Research and Manufacturers of America ("PhRMA")] general counsel position which was then vacant." *Id.*  Third, Van Itallie disclosed that he "had a meeting in Philadelphia with P.D. Villar[r]eal in June 2012 (and follow up emails) to discuss some programs [Villarreal] had in place at [GlaxoSmithKline] in which [Van Itallie] was interested because of a course [he] was scheduled to teach at Columbia [L]aw [S]chool on the role of the in house counsel." *Id.*  Van Itallie concluded that "none of these interactions . . . compromise[d his] neutrality or impartiality in any fashion." *Id.*

On February 22, 2013, PeriCor again objected to Van Itallie's appointment as an arbitrator. *See* Spehr Aff. Ex. 54.  On February 27, 2013, Merck again opposed PeriCor's objections. *See* Spehr Aff. Ex. 55.  On March 6, 2013, the AAA "reaffirmed" Van Itallie's appointment.  Spehr Aff. Ex. 46.

PeriCor now contends that Van Itallie has additional connections to Kuhlik, Villarreal, and Wolmart that he failed to disclose previously.  With regard to Kuhlik, PeriCor argues that Kuhlik was a member of the PhRMA "Law Section Executive Committee" at the time Van Itallie sought Kuhlik's support for the general counsel position at PhRMA, that Van Itallie and Kuhlik both live in Princeton, New Jersey, and that, in the 1990s, Kuhlik filed, on behalf of PhRMA, an amicus brief in a case for which Van Itallie was counsel of record.  *See* Resp't's Br. at 11; Finley Decl. Exs. N, O, P, Q.  With regard to Villarreal, PeriCor argues that, in 2009, he and Van Itallie both served as members of the College of Commercial Arbitrators' Corporate Counsel Task Force.  *See* Resp't's Br. at 11; Finley Decl. Ex. R.  Finally, with regard to Wolmart, PeriCor argues that she

and Van Itallie "were two of only five" members of the operating committee at the Civil Justice

Reform Group. Resp't's Br. at 11; *see* Finley Decl. Ex. S.

### B.     The Award

On December 28, 2015, the AAA served the Award, as well as one arbitrator's dissent, on

the parties. The panel held that Merck did not breach Section 16.6 of the Agreement, but did

breach Section 8. First, the panel concluded that Merck did not breach Section 16.6 by terminating

the Phase III clinical trial without providing the requisite notice ninety days beforehand because

Section 16.6 was included for Merck's "convenience, and Merck chose not to invoke it." Award

¶ 72. Second, the panel concluded that Merck did breach Section 8 of the Agreement by failing to

use "Commercially Reasonable Efforts" to develop acadesine after ending the trial for futility. *See*

*id.* ¶¶ 73–79. As the panel reasoned:

> Faced with its desire to stop the continuing expense associated with
> the ongoing . . . trial, Merck essentially had two choices: (i)
> terminate the Agreement for convenience under Section 16.6; or (ii)
> do an interim analysis of some sort and then stop the trial if the
> analysis showed little promise for a successful outcome. Merck
> chose the second alternative, but, after doing so, breached its
> obligation to use Commercially Reasonable Efforts to
> commercialize [a]cadesine when it stopped further Development.
> This breach was not excused even assuming *arguendo* that the trial
> was correctly stopped for futility. The breach was the failure to
> continue with Development, a failure not excused even if the trial
> legitimately proved unsuccessful. The contract's definition of
> "Development" is not limited to Merck's conduct of the . . . trial.

*Id.* ¶ 79. The panel also concluded that PeriCor provided adequate notice to Merck of its intention

to terminate the Agreement for breach pursuant to Section 16.4, and that Merck failed to cure the

breach by resuming its development of acadesine. *See id.* ¶¶ 80–89.

Because the panel determined that PeriCor terminated the Agreement pursuant to Section

16.4, it reviewed the enumerated remedies listed in Section 16.8. *See id.* ¶ 90. Pursuant to Section

16.8(a), the panel ruled, PeriCor was entitled to recover the license it had granted to Schering (and obtained by Merck). *See id.* ¶ 91. The panel held, however, that PeriCor was not entitled to any monetary damages as a result of Merck's breach because it "failed to demonstrate that it suffered any damages based upon Merck's determination to stop development of [a]cadesine" after the Phase III clinical trial was terminated for futility. *Id.* ¶ 93.

That could have ended the panel's analysis. It went on, however, to note that "even if Merck had terminated for convenience under Section 16.6, PeriCor would still not have been entitled to recover money damages." *Id.* ¶ 94. The panel "found no such breach," but nonetheless stated "that, in view of the briefing expended on the issue and the divergent views of the Tribunal, it would be helpful to discuss whether damages would have been appropriate for a breach of that Section." *Id.* ¶ 103. The panel then rejected PeriCor's argument that it could have recovered the approximately $15 million value of Merck's continued execution of the trial for ninety days, corresponding to the amount of notice Merck would have had to provide to terminate the Agreement pursuant to Section 16.6. *See id.* ¶¶ 104–09.

The panel thus ultimately terminated the Agreement as well as Merck's license to develop acadesine, but denied PeriCor's claims for damages. *See id.* ¶ 122.

IV.    **Procedural History**

After receiving the Award, Merck initiated this action by filing the instant Petition to confirm. Dkt. 1. PeriCor opposed the Petition and moved to vacate the Award. Dkt. 16.

**LEGAL STANDARD**

"Courts . . . 'play only a limited role when asked to review the decision of an arbitrator.'" *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 138 (2d Cir. 2007) (quoting *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 36 (1987)). "Normally, confirmation of an arbitration award is 'a summary proceeding that merely makes what is already

a final arbitration award a judgment of the court.'" *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95,

110 (2d Cir. 2006) (quoting *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984)).

      "A decision of an arbitrator, however, is not totally impervious to judicial review." *Porzig*,

497 F.3d at 139.    The Federal Arbitration Act ("FAA") "provides four statutory grounds for

vacatur" and, "[i]n addition, a court may vacate an award if it exhibits a 'manifest disregard of the

law.'" *Id.* (quoting *Goldman v. Architectural Iron Co.*, 306 F.3d 1214, 1216 (2d Cir. 2002)).    The

FAA's four statutory grounds for vacatur are:

> (1) where the award was procured by corruption, fraud, or undue
> means; (2) where there was evident partiality or corruption in the
> arbitrators, or either of them; (3) where the arbitrators were guilty of
> misconduct in refusing to postpone the hearing, upon sufficient
> cause shown, or in refusing to hear evidence pertinent and material
> to the controversy; or of any other misbehavior by which the rights
> of any party have been prejudiced; or (4) where the arbitrators
> exceeded their powers, or so imperfectly executed them that a
> mutual, final, and definite award upon the subject matter submitted
> was not made.

9 U.S.C. § 10(a).

      "A party moving to vacate an arbitration award has the burden of proof, and the showing

required to avoid confirmation is very high." *D.H. Blair*, 462 F.3d at 110.    "[U]nless [an] award

is vacated, modified, or corrected," it "must" be confirmed.    9 U.S.C. § 9.

## DISCUSSION

      PeriCor urges the Court to vacate the Award for three independent reasons.    First, it argues

that Van Itallie was an evidently partial arbitrator who favored Merck in violation of 9 U.S.C.

§ 10(a)(2).    *See* Resp't's Br. at 18–24.    Second, it argues that the Award manifestly disregarded

Delaware's law of contract damages.    *See id.* at 25–29.    Third, it argues that the Award did not

render a final decision on the merits in violation of 9 U.S.C. § 10(a)(4) because it failed to consider

PeriCor's alternative theory of restitutionary damages for Merck's breach of contract.    *See id.* at

10

29–33. Because the Court does not find any of these arguments persuasive, PeriCor's motion to vacate is denied and Merck's petition to confirm the Award is granted.

## I.    Evident Partiality

"In this Circuit, 'evident partiality within the meaning of 9 U.S.C. § 10 will be found where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration.'" *Scandinavian Reinsurance Co. v. Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 72 (2d Cir. 2012) (quoting *Morelite Constr. Corp. v. N.Y.C. Dist. Council Carpenters Benefit Funds*, 748 F.2d 79, 84 (2d Cir. 1984)). "Unlike a judge, who can be disqualified in any proceeding in which his impartiality *might* reasonably be questioned, an arbitrator is disqualified only when a reasonable person, considering all of the circumstances, would *have* to conclude that an arbitrator was partial to one side." *Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.*, 492 F.3d 132, 137 (2d Cir. 2007) (emphasis in original) (internal quotations and citations omitted). Some of the relevant circumstances may be:

> (1) the extent and character of the personal interest, pecuniary or otherwise, of the arbitrator in the proceedings; (2) the directness of the relationship between the arbitrator and the party he is alleged to favor; (3) the connection of that relationship to the arbitrator; and (4) the proximity in time between the relationship and the arbitration proceeding.

*Scandinavian Reinsurance*, 668 F.3d at 74 (quoting *Three S Del., Inc. v. DataQuick Info. Sys., Inc.*, 492 F.3d 520, 530 (4th Cir. 2007)). These factors, while "useful," are not "mandatory, exclusive or dispositive." *Id.*

In *Morelite*—which first set forth the Second Circuit's evident partiality test—the court explicitly recognized that "parties agree to arbitrate precisely because they prefer a tribunal with expertise regarding the particular subject matter of their dispute" and that "[f]amiliarity with a discipline often comes at the expense of complete impartiality." 748 F.2d at 83. The *Morelite*

court thus concluded that "to disqualify any arbitrator who had professional dealings with one of the parties (to say nothing of a social acquaintanceship) would make it impossible, in some circumstances, to find a qualified arbitrator at all." *Id.* "Mindful of the trade-off between expertise and impartiality, and cognizant of the voluntary nature of submitting to arbitration," the court ultimately interpreted the FAA to avoid "render[ing] this efficient means of dispute resolution ineffective in many commercial settings." *Id.* at 83–84.

When an arbitrator fails to disclose information that could establish his bias, courts undertake a somewhat different analysis. "An arbitrator who knows of a material relationship with a party and fails to disclose it meets *Morelite*'s 'evident partiality' standard: A reasonable person would have to conclude that an arbitrator who failed to disclose under such circumstances was partial to one side." *Applied Indus.*, 492 F.3d at 137. An arbitrator therefore "must take steps to ensure that the parties are not misled into believing that no nontrivial conflict exists." *Id.* at 138. "[W]here an arbitrator has reason to believe that a nontrivial conflict of interest might exist, he must (1) investigate the conflict (which may reveal information that must be disclosed . . . ) or (2) disclose his reasons for believing there might be a conflict and his intention not to investigate." *Id.* In creating this standard, the *Applied Industrial* court emphasized that it was

> *not* creating a free-standing duty to investigate. The mere failure to investigate is not, by itself, sufficient to vacate an arbitration award. But, when an arbitrator knows of a potential conflict, a failure to either investigate or disclose an intention not to investigate is indicative of evident partiality.

*Id.* "It follows that the materiality of the undisclosed conflict drives a finding of evident partiality, not the failure to disclose or investigate *per se*." *Nat'l Indem. Co. v. IRB Brasil Resseguros S.A.*, ___ F. Supp. 3d ___, 2016 WL 1030139, at *14 (S.D.N.Y. Mar. 10, 2016) (citing *Scandinavian Reinsurance*, 668 F.3d at 77 ("The nondisclosure does not by itself constitute evident partiality.

The question is whether the *facts* that were not disclosed suggest a material conflict of interest." (emphasis in original))).

PeriCor contends that a reasonable person would have to conclude that Van Itallie was partial in Merck's favor based on the information included in his two disclosures, the timing of the disclosures, and the information left undisclosed. *See* Resp't's Br. at 19–23. With regard to the information included in Van Itallie's disclosures, PeriCor argues that Van Itallie "minimized [his] contacts" with Merck employees and "downplayed his own personal interests in his relationship with Merck and its key executives." *Id.* at 19. As for information not included in the disclosures, PeriCor cites additional connections between Van Itallie and Merck employees and the joint venture that Johnson & Johnson (Van Itallie's former employer) had with Merck that was represented on various occasions by the law firm of Patterson Belknap (at which Van Itallie used to be a partner). *See id.* at 20–21. The Court will first consider Van Itallie's disclosures, and then turn to the information not disclosed that PeriCor contends is material.

### A.   Van Itallie's Disclosures

As a preliminary matter, PeriCor argues that some of Van Itallie's disclosures were "belated" in that information in Van Itallie's second disclosure should have been included in his first one. Resp't's Br. at 20. According to PeriCor, "[a]n arbitrator cannot cure a prior material omission simply by disclosing the previously-withheld information at some later point." Resp't's Reply Br. at 4. The Court disagrees. Although it may have been more prudent for Van Itallie to have made all his disclosures initially, "the proposition that [an arbitrator] ha[s] . . . an obligation of 'timely disclosure' in this context is unfounded in law." *Nat'l Indem. Co.*, 2016 WL 1030139, at *15. In *National Indemnity Co.*, the court rejected the argument that an arbitrator's delay in disclosing allegedly material information constituted evident partiality. *See id.* at *14–16. The court noted that neither the parties nor the court had found "a case holding an arbitrator's voluntary

disclosure of a potential conflict after his or her selection, rather than before, to be grounds for vacatur." *Id.* at *15. The same is true here, and neither of the two cases PeriCor cites supports its argument. *See* Resp't's Reply Br. at 4–5. In *Applied Industrial*, the arbitrator failed to disclose a conflict at any point prior to deciding the issue of liability. *See* 492 F.3d at 135. In *Sun Refining & Marketing Co. v. Statheros Shipping Corp.*, although the arbitrator did disclose the conflict after being appointed but before issuing an award, the court did not rely on the timing of the arbitrator's disclosures in determining whether to vacate the award. *See* 761 F. Supp. 293, 301 (S.D.N.Y. 1991) ("The issue in this case is not whether [the arbitrator] fully disclosed his relationship with Sun at the proper time. Rather, the issue involves the consequences of [the arbitrator's] failure to resign from the panel when Sun entered a prompt and timely objection."). The Court thus agrees with *National Indemnity Co.* that Second Circuit law does not impose a duty of "timely disclosure" on arbitrators. Although in some cases, an arbitrator's failure to disclose information in the first instance may support an inference of bias, the instant facts do not support such a theory because all the necessary disclosures were made well before Van Itallie was called upon to hear evidence or make a decision, allowing PeriCor the opportunity to object to his appointment after considering all the facts he disclosed.[2] The relevant inquiry for the Court here thus relates not to the timing of the disclosures but the information Van Itallie did disclose and whether "a reasonable person would *have* to conclude that [Van Itallie] was partial to one party to the arbitration." *Morelite*, 748 F.2d at 84 (emphasis added).

---

[2] PeriCor objected to Van Itallie's appointment based on his first disclosure. *See* Finley Decl. Ex. L; Spehr Aff. Ex. 50. The day after Van Itallie made his second disclosure, the AAA notified the parties that they could object again. *See* Spehr Aff. Ex. 53. PeriCor did, *see* Spehr Aff. Ex. 54, and the AAA's Executive Administrative Review Committee "reaffirmed" Van Itallie's appointment, Spehr Aff. Ex. 46. Pursuant to Rule 17 of the AAA's Commercial Arbitration Rules and Mediation Procedures in effect at the time, this decision was "conclusive." AAA Commercial Arbitration Rule R-17(b), Amended and Effective June 1, 2009.

In his two disclosures to the AAA, Van Itallie identified the following individuals working

for Merck and Schering and the following connections he had to them:

- Bruce Kuhlik, Merck's general counsel: Van Itallie "had infrequent professional dealings over the years" with Kuhlik. In his second disclosure, Van Itallie added that he "had a brief interaction with [Kuhlik] in late 2011 when [Van Itallie] sought [Kuhlik's] support regarding [Van Itallie's] interest in interviewing for the [PhRMA] general counsel position which was then vacant."

- P.D. Villarreal, Schering's former head of litigation at the time it was acquired by Merck and now at GlaxoSmithKline: Van Itallie met Villarreal "through the Chief Litigation Counsel Association" and considers Villarreal to be "a friend [he] see[s] rarely." In his second disclosure, Van Itallie added that in June 2012, he met with Villarreal and exchanged subsequent emails with him "to discuss some programs [Villarreal] had in place at GSK in which [Van Itallie] was interested because of a course [he] was scheduled to teach at Columbia [L]aw [S]chool on the role of the in house counsel."

- Lisa Martinez Wolmart, formerly a lawyer at Schering and now at Merck: In his second disclosure, Van Itallie stated that he and Wolmert served together on the operating committee of the Civil Justice Reform Group from 2006 to 2008. The committee "endeavored to meet on a monthly basis during that period."

- Ken Frazier, Merck's former general counsel, and Tom Sabatino, Schering's former general counsel: In his second disclosure, Van Itallie stated that he "attended a number of . . . meetings and phone calls" related to civil justice reform activities that Frazier and Sabatino also attended.

Finley Decl. Exs. K, M; Speher Aff. Exs. 45, 52. According to PeriCor, the only conclusion a

reasonable person could draw from these relationships is that Van Itallie favored Merck in the

arbitration. PeriCor focuses primarily on Van Itallie's effort to obtain Kuhlik's support for the

general counsel position at PhRMA, which PeriCor characterizes as "not an instance of some mere

'professional' relationship" because "Van Itallie looked to Mr. Kuhlik to advance his own financial

and career interests in obtaining a prestigious job." Resp't's Br. at 19. Merck responds that the

relationships on which PeriCor relies "merely show that Mr. Van Itallie was a member of a

'tightly[]knit professional community' in which 'key members are known to one another, and in

fact may work with, or for, one another, from time to time.'" Pet'r's Opp. Br. at 24 (quoting *Morelite*, 748 F.2d at 83).

The Court agrees with Merck. *Morelite* explicitly recognizes that "parties agree to arbitrate precisely because they prefer a tribunal with expertise regarding the particular subject matter of their dispute" and that "'[e]xpertise in an industry is accompanied by exposure, in ways large and small, to those engaged in it.'" 748 F.2d at 83 (quoting *Andros Compania Maritima, S.A. v. Marc Rich & Co.*, 579 F.2d 691, 701 (2d Cir. 1978)). The FAA thus does not prohibit arbitrators from having any personal and professional relationships with individuals who work in the industries in which they have expertise. *See id.*; *Int'l Produce, Inc v. A/S Rosshavet*, 638 F.2d 548, 552 (2d Cir. 1981) ("The most sought-after arbitrators are those who are prominent and experienced members of the specific business community in which the dispute to be arbitrated arose. Since they are chosen precisely because of their involvement in that community, some degree of overlapping representation and interest inevitably results."). Indeed, an arbitrator's exposure to the relevant industry is practically guaranteed when the agreement to arbitrate requires expertise in the relevant field, as the Agreement did here. *See* Agmt. § 17.2(c) (requiring the arbitrators selected to be "knowledgeable in the subject matter at issue in the dispute"). This is so because "to the extent an arbitration clause (such as this one) requires arbitrators with specialized experience in a certain field, the available number of arbitrators will be limited, and, relatedly, specialized arbitrators are more likely to have come into contact with the parties operating in their field." *Nat'l Indem. Co.*, 2016 WL 1030139, at *17.

In light of these considerations, Van Itallie's relationships with Villarreal, Wolmart, Frazier, and Sabatino do not justify vacating the Award. Van Itallie met all these individuals through professional organizations such as the Chief Litigation Counsel Association and the Civil

16

Justice Reform Group and his interactions with them were not substantial. Neither the nature of their relationships nor their intimacy compels the conclusion that Van Itallie *must* have favored Merck in the arbitration. The Second Circuit has affirmed arbitration awards in the face of industry relationships closer than these. *See Lucent Techs. Inc. v. Tatung Co.*, 379 F.3d 24, 31–32 (2d Cir. 2004) (confirming award when arbitrator had previously served as an expert witness for one of the parties in arbitration); *Andros Compania*, 579 F.2d at 701–02 (confirming award when arbitrator had previously served on nineteen arbitration panels with the president of the company that operated the ship involved in the arbitration).

Nor does the fact that Van Itallie solicited a job recommendation from Kuhlik justify vacatur. PeriCor argues that Van Itallie's interaction with Kuhlik is especially troublesome because Van Itallie "looked to Mr. Kuhlik to advance his own financial and career interests in obtaining a prestigious job." Resp't's Br. at 19. In so doing, PeriCor implies that Van Itallie had a financial incentive to rule in Merck's favor.

This contention is unsupported by law. "[T]he balance of case law in the Second Circuit supports the proposition that when a purported financial interest or financial relationship between an arbitrator and a party to arbitration is indirect, general or tangential, courts should not vacate arbitration awards." *Transportes Coal Sea de Venezuela C.A. v. SMT Shipmanagement & Transport Ltd.*, No. 09-CV-9029 (KMK), 2007 WL 62715, at *6 (S.D.N.Y. Jan. 9, 2007) (reviewing case law). The allegation that Van Itallie had a financial interest in the PeriCor–Merck arbitration by virtue of his soliciting Kuhlik's support for a job at an unrelated entity years prior to the arbitration hearing or award is speculative at best. PeriCor identifies no direct connection between Van Itallie and the outcome of the arbitration. Instead, PeriCor theorizes that by ruling in Merck's favor on the merits, Van Itallie may have obtained Kuhlik's support for a job that would

have had to remain vacant through years of arbitration proceedings. As far-fetched as that possibility appears to be, it is made even more unlikely given that nothing in the record supports the inference that Kuhlik's recommendation turned on Van Itallie's ruling in the arbitration or the inference that Van Itallie thought Kuhlik's support would prove dispositive.

To the extent PeriCor's argument is based on the closeness of Van Itallie's relationship with Kuhlik, that too is unpersuasive. The law of this Circuit recognizes that "[f]amiliarity with a discipline often comes at the expense of complete impartiality." *Morelite*, 748 F.2d at 83. Given that the Agreement required that arbitrators be "knowledgeable in the subject matter at issue in the dispute," Agmt. § 17.2(c), PeriCor and Merck were on notice that their arbitrators may well be familiar to the parties selecting them. While Van Itallie's "brief interaction" with Kuhlik in which he sought Kuhlik's support over a year prior to his disclosure of that interaction is surely relevant, it is not disqualifying. It is not uncommon for professionals in the same industry to reach out to one another—or seek advice or support—regarding job opportunities in their given field. Because nothing in the record suggests that Van Itallie's relationship with Kuhlik was anything other than professional in nature, as he represented, a reasonable person would not *have* to conclude that Van Itallie was biased in Kuhlik's—and thus Merck's—favor. Van Itallie's relationship with Kuhlik thus does not warrant vacating the Award.

## B.    Van Itallie's Undisclosed Contacts

PeriCor also argues that Van Itallie failed to disclose the following additional connections to Kuhlik, Villarreal, and Wolmart, namely:

- Kuhlik: Kuhlik was a member of PhRMA's Law Section Executive Committee when Van Itallie contacted him; Kuhlik and Van Itallie both live in Princeton, New Jersey; and Kuhlik filed, on behalf of PhRMA, an amicus brief in the 1990s in a case for which Van Itallie was counsel of record. *See* Finley Decl. Exs. N, O, P, Q.

- Villarreal: In 2009, Villarreal and Van Itallie served together as members of the College of Commercial Arbitrators' Corporate Counsel Task Force. *See* Finley Decl. Ex. R.

- Wolmart: The Civil Justice Reform Group's operating committee—on which Wolmart and Van Itallie both served—had only five members. *See* Finley Decl. Ex. S.

None of these connections are so material that Van Itallie had a duty to disclose them. They instead range from tangential to arguably frivolous (*i.e.*, that Van Itallie was connected to Kuhlik by virtue of the fact that they both live in a town with more than 15,000 residents). The disclosure requirement "is not an onerous one" and "an arbitrator 'cannot be expected to provide the parties with his complete and unexpurgated business biography.'" *Applied Indus.*, 492 F.3d at 139 (quoting *Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 151 (1968) (White, J., concurring)); *see also Scandinavian Reinsurance*, 668 F.3d at 77 ("The FAA does not bestow on a party the right to receive information about every matter that it might consider important or useful in presenting its case."). As discussed above, Van Itallie disclosed his relationships with Kuhlik, Villarreal, and Wolmart; he was not required to disclose every detail thereof. That he did not do so does not establish evident partiality.

## C.    The Joint Venture

Lastly, PeriCor argues that Van Itallie's bias can also be inferred because he "never disclosed his involvement in the significant joint venture between Merck and [Johnson & Johnson], from which he personally profited by virtue of his law firm's representation of the joint venture in several cases and in which he was involved as [Johnson & Johnson's] Chief of Litigation." Resp't's Br. at 22. Because "the *facts* that were not disclosed" do not "suggest a material conflict of interest," however, "[t]he nondisclosure does not by itself constitute evident partiality." *Scandinavian Reinsurance*, 668 F.3d at 77 (emphasis in original).

Van Italie's prior employment at Johnson & Johnson (which had the joint venture with Merck) and Patterson Belknap (which represented the joint venture) does not "indicate the possibility of bias" such that it would create a material conflict requiring disclosure. *Id.* at 75. Van Italie worked at Patterson Belknap from 1977 to 1996 and at Johnson & Johnson from 1996 to 2009, years—and in Patterson Belknap's case, more than a decade—before Merck appointed him as an arbitrator. *Compare* Spehr Aff. Ex. 45 (Van Italie's resume) *with* Spehr Aff. Ex. 44 (appointing Van Italie on October 26, 2012). Although, as PeriCor notes, Patterson Belknap represented the joint venture at the time Van Italie was employed there, Van Italie did not appear as counsel of record in any of the cases PeriCor cites. *See* Finley Decl. Ex. L. PeriCor's claim that Van Italie "personally profited" from the representations is thus based only on the fact that Van Italie was a partner at Patterson Belknap at the time of the representations. As discussed above, however, "when a purported financial interest or financial relationship between an arbitrator and a party to arbitration is indirect, general or tangential, courts should not vacate arbitration awards." *Transportes Coal Sea de Venezuela*, 2007 WL 62715, at *6. The joint venture, moreover, had no relevance to the substance of PeriCor's arbitration proceeding. On the facts before the Court, to the extent Van Italie was personally involved in the joint venture at all, his involvement does not justify vacatur.

The joint venture is also insufficient to justify vacating the Award because Van Italie was not employed at either Patterson Belknap or Johnson & Johnson at the time he was appointed as an arbitrator in the underlying proceeding here. When an arbitrator's "relationship with [a party] materially ended before [the party] appointed him as an arbitrator . . . , [courts] cannot say that 'a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration.'" *Lucent Techs. Inc.*, 379 F.3d at 31 (quoting *Morelite*, 748 F.2d at 84)). Van Italie's

connection to Merck through the joint venture ended years before he was appointed as an arbitrator here. For this reason, the three cases on which PeriCor primarily relies to argue that the joint venture required disclosure are all distinguishable. *See* Respt's Br. at 21–23. In all three cases, the arbitrator worked *at the time of the arbitration* for an entity that had a financial relationship with or interest in one of the parties to the arbitration. *See Applied Industries*, 492 F.3d at 135 (arbitrator was, at the time of the arbitration, the chairman, president, and CEO of a company, a division of which had a commercial relationship with one of the parties); *Sun Refining*, 761 F. Supp. at 295 (arbitrator was, at the time of the arbitration, the president of the agent of—and a witness for—an entity involved in an arbitration against one of the parties to the arbitration for which the arbitrator was appointed); *Schmitz v. Zilveti*, 20 F.3d 1043, 1044 (9th Cir. 1994) (arbitrator was, at the time of the arbitration, an attorney at a law firm that represented the parent company of one of the parties in the arbitration).[3] Even if a material conflict of interest related to the joint venture existed at some point in time, it ended well before Van Itallie's involvement in this case began.

*     *     *

PeriCor has not satisfied its burden to establish that, considering all of the circumstances, a reasonable person would *have* to conclude that Van Itallie was partial to Merck in the arbitration. Nor has PeriCor, for the same reasons discussed above, established "clear evidence of impropriety" necessary to authorize post-arbitration award discovery. *NGC Network Asia, LLC v. PAC Pac.*

---

[3] The Court also agrees with Judge Rakoff that *Schmitz* is also distinguishable because "[t]he requirement that this Court must perceive partiality so clearly that it 'would *have* to conclude' the arbitrator was biased before vacating the awards differs from the standard elaborated by the Ninth Circuit, which looks only for 'an impression of possible bias.'" *Ometto v. ASA Bioenergy Holding A.G.*, No. 12-CV-1328 (JSR), 2013 WL 174259, at *4 (S.D.N.Y. Jan. 9, 2013) (quoting *New Regency Prods., Inc. v. Nippon Herald Films, Inc.*, 501 F.3d 1101, 1108 (9th Cir. 2007)). "Thus, [a party's] reliance on the Ninth Circuit case of *Schmitz v. Zilveti* . . . is both non-binding on this Court and countermanded by the more circumspect view of 'evident partiality' adopted by this Circuit." *Id.*

*Grp. Int'l, Inc.*, 511 F. App'x 86, 89 (2d Cir. 2013) (quoting *Lucent Techs.*, 379 F.3d at 32).  The
Court thus denies PeriCor's request to vacate the Award pursuant to 9 U.S.C. § 10(a)(2), or, in the
alternative, to take discovery.

## II.     PeriCor's Other Arguments

PeriCor also argues that the Award "manifestly disregarded Delaware law regarding
expectancy damages for breach of contract," Resp't's Br. at 25, and that the Award "failed
completely to address one issue presented to it, namely PeriCor's alternative theory of
restitutionary damages," *id.* at 29.  Both of these theories fail, however, because they are premised
on a termination of the Agreement pursuant to Section 16.6 and not PeriCor's damages due to
Merck's failure to use commercially reasonable efforts to develop acadesine pursuant to Section
8—the only provision the panel found to have been breached.

"[A]s a general matter, a court is required to enforce [an] arbitration award as long as there
is a 'barely colorable justification for the outcome reached.'" *Leeward Constr. Co. v. Am. Univ.
of Antigua-Coll. of Med.*, ___ F.3d ___, 2016 WL 3457266, at *2 (2d Cir. June 24, 2016) (quoting
*Banco del Seguros del Estadio v. Mut. Marine Office, Inc.*, 344 F.3d 255, 260 (2d Cir. 2003)).
Courts in this Circuit "will . . . not vacate an arbitral award for an erroneous application of the law
if a proper application of law would have yielded the same result." *Duferco Int'l Steel Trading v.
T. Klaveness Shipping A/S*, 333 F.3d 383, 390 (2d Cir. 2003).  Applying this rule, Judge Rakoff
recently denied a motion to vacate an arbitration award that improperly characterized discovery
sanctions as punitive damages because even though they were described incorrectly, the arbitrators
were authorized to impose such sanctions. *See Belesis v. Lowery*, No. 15-CV-2633 (JSR), 2015
WL 4563306, at *3 (S.D.N.Y. July 19, 2015) (citing *Duferco*, 333 F.3d at 390).

These principles are fatal to PeriCor's challenges to the Award's damages analysis.  "After
due consideration," the panel "agree[d] with Merck" that Section 16.6, which permitted Merck to

terminate the Agreement on ninety days' notice, "is not the proper contract section that deals with the facts presented here." Award ¶ 72. PeriCor does not dispute that portion of the Award. The panel also found that Merck had breached its duty to use "Commercially Reasonable Efforts" to develop acadesine under Section 8 of the Agreement. *See id.* ¶¶ 75–79. In spite of this breach, however, the panel concluded that PeriCor "failed to demonstrate that it suffered any damages based upon Merck's determination to stop development of [a]cadesine." *Id.* ¶ 93. According to the Award, that determination occurred *after* Merck conducted its futility analysis and stopped the clinical trial. *See id.* ¶ 79. In paragraph 79, the panel reasoned that:

> Faced with its desire to stop the continuing expense associated with the ongoing . . . trial, Merck essentially had two choices: (i) terminate the Agreement for convenience under Section 16.6; or (ii) do an interim analysis of some sort and then stop the trial if the analysis showed little promise for a successful outcome. Merck chose the second alternative, but, after doing so, breached its obligation to use Commercially Reasonable Efforts to commercialize [a]cadesine when it stopped further Development.

*Id.*[4] Implicit in this analysis was a determination that Merck's decision to stop the trial for futility did not itself breach Section 8 of the Agreement. Indeed, "reject[ing] the implication that the [s]tudy, taken to the bitter end[,] . . . would have had a realistic chance of a successful trial outcome," *id.* ¶ 100, the panel found that "[a]cadesine was highly unlikely to be approved for sale by the FDA," *id.* ¶ 102. In light of that and the Award's "conclu[sion] that an additional 90 days

---

[4] Other portions of the Award reinforce the Court's conclusion that the panel's holding was based on Merck's breach of Section 8 *after* it stopped the clinical trial and took no additional steps to develop acadesine. *See* Award ¶¶ 72 ("Merck's failure to commercialize the compound after the trial ended for futility, however, had other consequences under the Agreement."); 74 ("Merck stopped the . . . trial for futility in July 2010 and then effectively abandoned all development efforts. . . . Merck's abandonment of development efforts constituted a failure to use Commercially Reasonable Efforts under [Section] 8 of the Agreement."); 76 (ruling that Merck's effort to maintain foreign patents related to acadesine after the clinical trial was stopped "do not constitute a revival of Development efforts after termination of the . . . trial"). Read as a whole, the Award draws a clear distinction between Merck's conduct when the clinical trial was ongoing (and Merck was accordingly using commercially reasonable efforts to develop acadesine) and after the clinical trial was stopped (and Merck ceased using such efforts).

of data would have been essentially worthless to PeriCor," *id.* ¶ 107, it is difficult to read the Award as saying anything other than that it was commercially reasonable for Merck to stop the trial.

Having stopped the trial, Merck was nevertheless obligated to take other commercially reasonable steps to develop acadesine. The panel found that it did not do so. *See id.* ¶ 76 ("There is little doubt that Merck abandoned *all* Development efforts after it stopped the . . . trial for futility." (emphasis added)). According to the panel, Merck therefore breached the Agreement by failing to take the necessary commercially reasonable steps required by Section 8 after stopping the trial.

Under Delaware law, "[c]ontract damages are designed to place the injured party in an action for breach of contract in the same place as he would have been if the contract had been performed." *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146 (Del. 2009) (internal quotation omitted). Given that the panel concluded that Merck's breach was limited to its conduct after stopping the trial, PeriCor's damages would thus be measured by determining the value of Merck's commercially reasonable efforts to develop acadesine during this—post-trial—period of time. The panel concluded that PeriCor "failed to demonstrate" such damages, Award ¶ 93, a narrow conclusion that PeriCor does not actually dispute here, and in any event, does not constitute a manifest disregard of the law.

PeriCor instead contests the panel's separate determination, reached only in light of "the briefing expended on the issue and the divergent views of the [arbitral] Tribunal," *id.* ¶ 103, that even if Merck had, by virtue of its decision to stop the trial, breached Section 16.6 by terminating the entire Agreement without providing ninety-days' notice, "PeriCor would still not have been entitled to recover money damages," *id.* ¶ 94. Having already found that Merck did not breach Section 16.6, *see id.* ¶¶ 67–72, the panel's analysis of this issue was dicta. Both of PeriCor's

damages arguments here relate to this analysis, not the Award's finding that PeriCor failed to establish any damages from Merck's failure to use commercially reasonable efforts to develop acadesine after ending the clinical trial. PeriCor argues the panel erred in two ways: (1) by considering consequential damages in the form of lost profits rather than PeriCor's expectation that it would receive the value of Merck's ninety days of additional performance, *see* Resp't's Br. at 25–26 (citing Award ¶ 96); and (2) by failing to consider a restitutionary theory of damages that would prevent Merck from saving what it would have had to spend on an additional ninety days of the trial, *see id.* at 31–32.

Had the Award concluded that Merck in fact breached Section 16.6's notice requirement or indicated it was Merck's stopping of the trial that breached Section 8, PeriCor might have a point. That was not, however, its conclusion. The panel determined only that Merck breached Section 8 by failing to use commercially reasonable efforts after it stopped the clinical trial and that PeriCor did not establish any damages based on the expected value of Merck's performance during that post-trial period. PeriCor's claims are thus foreclosed by *Duferco* and *Belesis* because even accepting PeriCor's arguments on the merits,[5] "a proper application of law would have yielded the same result," namely, that PeriCor was not entitled to collect damages for the breach that the panel held had actually occurred. *Duferco*, 333 F.3d at 390. Because the Award thus provides at least a "barely colorable justification for the outcome reached," *Banco del Seguros*, 344 F.3d at 260, PeriCor has not met its burden to establish grounds for vacatur.

## III.   Merck's Petition to Confirm

"[A] court 'must' confirm an arbitration award 'unless' it is vacated, modified, or corrected 'as prescribed' in §§ 10 and 11" of the FAA. *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576,

---

[5] In light of the Court's conclusion, it need not determine whether the Award analyzed PeriCor's potential damages for a breach of Section 16.6 correctly under Delaware law.

582 (2008) (quoting 10 U.S.C. § 9). PeriCor has identified no basis to vacate the Award other than those discussed above and rejected. Merck's petition to confirm the award is thus granted. *See Scandinavian Reinsurance*, 668 F.3d at 78–79.

## CONCLUSION

Merck & Co., Inc.'s petition to confirm the arbitration award is granted and PeriCor Therapeutics, Inc.'s motion to vacate the award is denied. The Clerk of Court is respectfully directed to terminate item number 16 on the docket, enter judgment in Merck's favor, and close this case.

SO ORDERED.

Dated:     August 24, 2016
           New York, New York

                                         Ronnie Abrams
                                         United States District Judge